And we'll turn to the last case on our calendar, the Christa McAuliffe Intermediate School PTO, Chinese American Citizens Alliance of Greater New York, and the Asian American Coalition for Education. This case is about New York City's effort to inject racial considerations into the admissions policy at its renowned specialized high schools. One of the many virtues of schools like Stuyvesant, Bronx Science, and Brooklyn Tech is their objective admissions policy. These schools care about your SHSET score. They don't care about your race or who your parents are. About half the students at these schools come from low income families, and even more of those are Asian American. However, the mayor and the chancellor are unhappy with the racial balance at the specialized high schools and seek to make the school's demographics mirror those of the city as a whole. That means an ultimate goal of fewer Asian American students, even though most of those students, like those at Christa McAuliffe Intermediate School, come from low income families and many are the children of immigrants. The mayor and the chancellor sought to change the admissions exam requirement, but since that is enshrined in state law, they use their power over the city schools to alter the eligibility requirements for the Discovery Program. Discovery is designed to give a second chance for admission for low income students who scored just below the cutoff, but in recent years before this current expansion, it was quite small and schools with high cutoffs, such as Stuyvesant and Bronx Science, did not participate at all. As a means to accomplish these racial goals, the mayor and the chancellor required each specialized school to set aside 20% of their seats in each incoming class for Discovery students. Was it just racial or wasn't it also geographic? So one of the concerns was, you know, people from these locations weren't going to those schools. There was an inadequate representation of the whole city in the schools itself on a geographic basis. Certainly, Your Honor, Mayor de Blasio has expressed concern that the city as a whole was not being represented. However, under Arlington Heights, so long as racial motivation is a motivating factor, and here the record is clear that the mayor and the chancellor considered race predominantly or at least or it was at least one of their major considerations for. Let me ask you this. I mean, this new program, the new Discovery Program doesn't race is not criteria for the program. You can see that, right? Yes, Your Honor. There's no factor of race in terms of the students themselves, correct? Yes, Your Honor. All right. So the question is on this goes to the likelihood of success on the merits. Is there any Supreme Court case, case from this court, or even broaden it to any circuit court, where the program did not have race as a factor that has strict scrutiny has applied? What Supreme Court case or what circuit case where race was not a factor in the criteria where a court has said, even though race was not a factor in the criteria, we're going to apply strict scrutiny here? Your Honor, the closest is Lewis v. Ascension Parish in the Fifth Circuit, the first of those cases before it was sent to remand. I thought they used race to assign students in that case. That was a redistricting, right? The district court in that case found that rational basis scrutiny applied simply because the geographic lines were race blind. However, the Fifth Circuit panel essentially asked for or required a remand in order to determine whether the — although the lines were geographic in nature, they were done with the purpose of — No, not just with the purpose, that they were using race. They were actually using race to assign students. Well, here — and, Your Honor, one of the factors in Lewis was that the Parish school district itself had used racial modeling to determine the outcome and the panel or the likely outcome of its plan. And the panel in that case thought that that was probative of — Let me ask you about Doe, the Third Circuit case. Isn't — do you think Doe is wrongly decided, or is that distinguishable from this case? Your Honor, we don't think that you would have to find that Doe was wrongly decided. That's a rule in our favor. The court in Doe expressly held that there was no evidence in the record that there was any intent that a particular race be disparately impacted in that case. It was simply a case where the city of Philadelphia was redrawing the lines in order to improve diversity. And that's a case where without the intent to, as the Supreme Court said in Feeney, what matters under Arlington Heights is the decision-maker's intent to adversely affect a particular group. But the intent is not to adversely affect a particular group, but to increase diversity. You're saying that's an impermissible intent? You can't have the intent to increase diversity in the schools or some other area? Is that your position? Not precisely, Your Honor. Our position is that in a situation such as this, where the effect of the program is to take seats away from certain students and — How do we know that? It seems like the data from the first year shows that there has not been what your clients were concerned about, this enormous impact on Asian students, right? Isn't that what the first year shows? Your Honor — No impact, right? As for the 2019 data, first of all, it isn't in the record. And second of all, there's significant possibility that it could be an outlier, given that the city's own modeling of the data based on the effect of this plan, based on 2017 numbers, show that there would be — I know it may be, but this is a preliminary injunction review. You're saying the district court should have granted a preliminary injunction, even though there's no indication even after the — well, I mean, the district court didn't have this. But, you know, why wouldn't it be more prudent to see if there's going to be this disparate impact that you talk about? Your Honor, even taking the 2019 data they submitted at face value, the racial purpose of the plan still persists, and our — and the students, particularly at Crystal McAuliffe Intermediate, who the PTO we represent, are still locked out of 20 percent of the seats at the specialized high schools. And the city's purpose for that, according to the mayor and the chancellor and the press releases and the Department of Education's presentation, was to change the racial balance to the detriment of Asian American students. So the fact that the data in 2019 might not have accomplished what the city expected it to or spit out the numbers the city expected doesn't necessarily mean that the students at the ineligible middle schools, such as Crystal McAuliffe, which is more than two-thirds Asian American, aren't being excluded from those seats on the basis of racial considerations under Arlington Heights. Can you address — in the Jana Rock case, quoting the Supreme Court, we said to equate desire to eliminate the discriminatory impact on some disadvantaged groups with an intent to discriminate against other groups could seriously stifle attempts to remedy discrimination. So what's your response to that? Your Honor, a broad reading of that quotation from Jana Rock would essentially eviscerate Arlington Heights. It would permit jurisdictions to discriminate using facially neutral means against overrepresented races in order to create a racial balance that they desire, even though the disparate impact was not caused by city or district policy. So the proper reading, I think, of those quotations from Hayden and Jana Rock is essentially that — the Supreme Court has recognized a compelling interest in remedying past discrimination and also that there are certain facially neutral — there are certain facially neutral policies that may be — that may be permitted to be enacted. However, it can't be extended to the point that — that you would — that — What concerns me is I'm not sure I see where the line is then. If you're saying a race-neutral policy that is designed to achieve greater diversity, if it's going to have a disparate impact on some group, ethnic group or group, that it's no good scrutiny. Isn't that what you're saying? I think the distinction, Your Honor, is between whether the policy is designed to improve opportunity for certain groups versus to change the outcomes. So the Supreme Court in Ricci explained that, of course, the city of New Haven in that case could have taken steps to provide greater opportunity for the minority test takers to succeed. However, when they scrapped the exam and gave a new one, that was disparate treatment. So here what we have is — so when you have an — here what we have is that the city has taken an established process and changed the rules so that the same exam, the SHSAT, would spit out different results that they hoped would be more amenable to them demographically. Mr. Keese, let me ask you a threshold question. You claim that you have associational standing. Standing is, of course, one of these ambiguous — seemingly ambiguous requirements in American law. But what exactly is your standing here? Without going to the merits of — that we have already treated to some degree, you're claiming you have so-called associational standing? We — Your Honor, we contend that we have — that the PTO has associational standing because its members — that it has standing to sue on behalf of its members. Let me just read you a segment of one of our cases in 2011. It is the law of this circuit that an organization does not have standing to assert the rights of its members in a case brought under 42 U.S.C. Section 1983 as we have interpreted the rights of Section 1983 secured to be personal to those purportedly injured. Your Honor, we — I recognize that there are certain Second Circuit cases, including — I believe that's NEB — Yes. — that — NNEB v. Dowse, D-A-U-S. Yes, Your Honor, that have held categorically that associations cannot assert the rights of their members in Section 1983 cases. However, that's contrary to Supreme Court precedent, including Northeastern Florida Association of General Contractors and parents involved. And in this circuit — But if so, we're in an awkward situation, aren't we? That is, assume for the argument you're right that our — the law of our circuit is in conflict with either the law of another circuit or with the law as stated by the Supreme Court. We as a court are institutionally bound to apply our own law, the law of the circuit, until it's reversed by an in-bank court, an in-bank rehearing of our court, or by the Supreme Court, right? Yes, Your Honor. However, there are — there have been panels of this court that have simply applied the three-part associational standing test in Hunt v. Washington State Apple Growers. For example, just a few months after the Northeastern Florida decision in the Supreme Court, this Court decided Rent Stabilization Association v. Dinkins, where it discussed at length the effect of Northeastern Florida, and simply distinguished it because the plaintiffs in that case were bringing regulatory takings claims which were not amenable to group representation. So this Court has recognized that Northeastern Florida changed the law, and in other cases, the Court has done that as well. So I think there's a conflict within panels in this Court, and this panel could go one way or the other. However, I also believe that the institutions — I just want to say quickly that the institutions have standing to sue in their own right, as the district court found correctly. It looks like my time is up. And procedurally, we're now at the — as Judge Bianco noted, at the preliminary injunction stage. So what exactly do you want from us here today? We're seeking, Your Honor, a — A remand? A remand with instructions to grant injunction before the 2020 cycle. A preliminary injunction, presumably, because you — Preliminary injunction. Have you had any evidentiary hearings? We are still in discovery at the district court. So — You haven't had any evidentiary hearings before the district court? No. It's currently — So what you would like is a remand for the completion of discovery and then a full trial on the merits. Yes, Your Honor. Presumably a consolidation of the preliminary and permanent injunction hearings. Yes, Your Honor. Okay. Thanks. Thank you. Mr. Moore? Yes. May it please the Court, my name is John Moore, representing the mayor and the chancellor. The district court did not abuse its discretion in denying plaintiffs the extraordinary relief of a preliminary injunction where plaintiffs' lackstanding cannot show irreparable harm and are unlikely to succeed on the merits. And I want to start on the threshold issues that the opposing counsel ended on. And there is a key point that decides this case on two independent threshold issues. And that key point is, as Judge Cabran has pointed out, that this circuit's law has consistently been, over the course of 40 years, and as recently reaffirmed as this last spring in the Poole decision, that organizations do not have standing to assert the rights of their members. Now, plaintiffs say, well, just ignore that law, because there's other cases that don't specifically speak to that issue that may come in tension with it, or that there's an apparent tension with Supreme Court precedent. None of that Supreme Court precedent, to the extent that there is tension, I want to point out, those decisions did not specifically address the question. At most, they assumed it. That none of those Supreme Court decisions post-date this last spring, where the Court recently reiterated the exact same rule that's followed. Roberts. No, but their alternative argument is that even under the — that by expending resources that they themselves have standing under, I don't know how you pronounce it, NMB, and other cases that have said if an organization has to expend resources to, in this case, oppose this plan, that that gives them standing independent of their members. So — And that's incorrect, Your Honor. And on that point, I direct Your Honor to the knife rights case from 2015. That was the facts of that case. I don't know. That wasn't changing the law. It was basically that whether or not there were going to be people prosecuted under that was the — Well, what the challenge — so in the knife rights case, there was a statute banning — it was a State law that banned the possession of gravity knives. And what plaintiffs were challenging was the application and interpretation of that law as it was going forward. And the organizational plaintiffs had dedicated resources to opposing that application and enforcement. Here, we have a State law that sets the requirement. In that case, ultimately, it was decided there wasn't — it wasn't clear that anyone was going to be prosecuted under that law, and that, therefore, the ongoing expenditures of resources was, I guess, speculative, right? Well, it was speculative particularly because the organizations themselves didn't face the risk of prosecution, that any — any future expenses that they incurred would be on behalf of their members, which is not the kind of standing that the plaintiffs hear or their canons. But we know here they continue to expend resources to keep opposing this indefinitely, right? Well, they say that in their reply brief, but they did not say that in their complaint. They did not say that in the first round of affirmations, and they didn't say that in the second round of affirmations. So to be able to assert standing based on a claim that's not made until their appellate reply brief would be inconsistent with the usual rules governing how standing has to be established. Even if I take that point, and again, I think the Knife Rights case does control it. I think it's on all fours with this instance. But even if there were Article III standing, if there's the ability to proceed with the case at all, there's still the second independent threshold issue, which is irreparable harm. If the only harm that the organizational — the only harm that the organizational plaintiffs have the ability to assert is their expenditure of time, money, and resources, that's — You didn't raise that below and that we shouldn't even consider that. I disagree. If Your Honor looks to page 244 of the appellee's appendix, what we argue is that there is not irreparable harm because none of the plaintiffs are imminently going to be participating, with the exception of Mr. Wong's daughter, are imminently going to be participating in the specialized admissions high school process. Are you arguing that below? So that's the same argument we're making, that there's no irreparable harm because these particular plaintiffs — But you make that argument at the district court is the question. Yes. So that was the argument below, and that's the argument that we're making now. And it plays out somewhat differently, and let me explain why that is. In the district court, the irreparable harm argument was ultimately didn't — wouldn't have gotten us very far, that the organizational plaintiffs can't show irreparable harm because Mr. Wong's daughter was still in the case. Here, where it is — where it is conceded that she is no longer participating in this — in the admissions process, where she no longer has to end in — and again, this is, I believe, footnote one in Appellee's reply brief. Why is that? Because she's aged out? Well, because she's already been placed into the — into a special — into a high school. Well, that's one of the famous problems with all of these cases, because from a defendant's point of view, you can — you can wait out any individual plaintiff will have graduated or will have moved out of the relevant group by the time a decision is made, right? Yes. I want to make two points in response to that. The first is that there's the possibility of pleading damages. And so to the extent that that's the harm, that you can allege past damages for past action, you don't have to get into prospective relief. And second, if — that ultimately speaks to the standing to proceed with the case at all. It doesn't speak to the irreparable harm question. Then again, if the irreparable harm, if what they're established — what their harm is, is the ability to seek — is their past expenditures, the money, time, resources, the Supreme Court in Sampson said that's not enough. Well, Mr. Moore, let me try a contrafactual question for you. If you were on their side, how would you cure this problem? What should they — in other words, what should they have done to pursue this case to at least achieve standing to proceed? So had they alleged in their complaint both past expenditures and the — in the willingness, ability, inclination to continue doing so, to make clear that they were imminently likely to need to continue doing so, I think that would cure it. If they had alleged — I'm sorry, I'm not understanding. What exactly would that claim be? It wouldn't have to be much. It would basically have to be we have opposed this and we will continue doing so as long as the policy is in place. As an association? Correct. And that would get them the standing at least to proceed with the case. All right. They could alternatively have pled damages. So why don't we just pause right there. Since a remand is necessary in any circumstance, if I understand your position, they can simply seek to amend their complaint by making precisely that claim, right? I believe — They could cure the problem is what I'm getting at. Yes. Although the knife rights case, which, as I've referred to earlier, actually denied the ability to replead. But if the court were inclined to do so, I don't think knife rights controls on that, then the case could be dismissed, again, entirely for standing with leave to replead. And they could remake those allegations. You don't have to dismiss it. You can just permit an amendment to the complaint, right? Yes. You're in the middle of discovery or whatever it is that's going on in the district court. It's not nearly a final judgment. Why can't they do that? No, I think they could. And they could also include a number of individual plaintiffs who are young enough to perhaps survive the many delays, right? Why couldn't they do that? That gets a little trickier because if we're talking about, you know, third grade students, they're not imminently likely to be applying for specialized high schools. But I take the point — On the other hand, by the time you're through with them — — they'll be in graduate school. I take the point. And to step back just a little bit, none of this helps on this appeal. None of this helps plaintiffs on this appeal. Why? Because they're still unable to show irreparable harm. They're still not able to show as organizations that their constitutional rights are going to suffer any harm. And with — If they were to have students added on remand who were applying now, right, this current cycle, so they then had irreparable harm, right, potentially. Different plaintiffs could have standing and could have irreparable harm. Why wouldn't the judge then have to, on this question of serious questions and the balance of hardships, some of the things that the district court relied upon wouldn't apply right now, right? Because part of it had to do with the offers were about to go out. They had been going to printing. There wasn't time to redo the criteria. But we're in December. So wouldn't on remand the district court have to now determine whether or not an injunction would be appropriate for this cycle? It would. And just — so the circumstances have changed. And I think, though, that ultimately the circumstances haven't changed that much just because of the time it's taken to litigate this case. We're now approaching the time, and I appreciate the opportunity to make this point because it's on my must-say list, is that in order for the Department of Education to be able to issue orders on a — not orders, I apologize — offers on a timely basis, the Department of Education is informing me that they would need a decision from the court, ideally by the end of the month, which I'm not going to presume to set deadlines for the court. But that's the timeline that we're looking at. The extension by January, it could be done with delays. Beyond that, it becomes — What is it that could be done in theory or hypothetically by the end of the year? So to change the procedures and process by which the offers are made. And so if we were to revert back to the prior discovery program, that would happen. Which would amount to either an amendment or supplanting the preliminary injunction with our own injunction, right? Yes, that's correct. And that's what you're suggesting? So if the court — By the end of the year. Correct. And so on that — so having said that, I want to turn briefly to discuss the merits of the case. Let me just ask you this question on the merits because this, to me, is the bottom-line question. Isn't it — isn't it — on the issue of what the intent of this is, isn't it to achieve racial demographics in these schools that most — more closely mirror the city? Isn't that the purpose of this new discovery program? I don't know if I fully agree with that. The purpose of the program is to increase racial, socioeconomic, and geographic diversity through the specialized high schools. And that consideration — and so certainly race is a consideration that comes into that. But that — the mere fact that race is considered is not itself grounds to trigger strict scrutiny. And I want to point out that the best case that plaintiffs offer for this, in their argument, was the Lewis I decision from the Fifth Circuit. They omit the fact that all the court in Lewis I decided was that we needed — that the court needed a little more facts to decide it. On Lewis II, when the case returned to the Fifth Circuit — If you want to determine that race was the primary reason for this plan, that altering the racial demographics in schools was the primary reason for the plan, wouldn't that implicate strict scrutiny? I don't think — so, no. There's two points on that. First, I don't think that's the case here. I think that race is certainly one consideration. It's not the primary consideration. Second, in order to get to strict scrutiny, you have to show both intent — It's the primary consideration, then, if it's not racial. Well, I don't know that I could say that there's a primary consideration. Again, racial, socioeconomic, and geographic diversity. Moreover, the intent has to be not just to consider race and to benefit one group. It has to specifically be to harm a group. And that's absent here. Despite plaintiff's allegations to the contrary, the mayor's and chancellor's comments are very clearly designed on bolstering the enrollment of an underrepresented group into the specialized high schools. That's a desire, and I have written down, plaintiffs agree that the intent must be to create an adverse effect. That's not the goal here. Finally, you also have to show, even if there were intent, which I think I made clear I strongly disagree with — The chancellor and the mayor have suggested that it is their intention, or it's arguably their intention. Have they been deposed yet? No, they have not been. And part of the reason for that is that in addition to showing intent, plaintiffs have to be able to show effect in order to get to strict scrutiny. And on that point, their claim completely fails. I mean, most dramatically, the largest beneficiary of the new discovery program criteria have been Asian Americans. Their numbers increased overall and specifically within the discovery program. The intent was not primarily race. It was just to help disadvantaged students. The amicus brief points out there are a lot of different ways this could have been framed to do that. They give the example, and I'm curious what your response to this is. If you have an Asian American child who's in a homeless shelter on welfare, if they go to a certain school, this program's not available to them. Does that make sense? Why would, if race is not the primary reason and you're just trying to reach disadvantaged kids, there are other ways this could be done just based upon economics as opposed to the way it's currently framed. Well, the program as it's currently structured is based on economics, and it's based on two separate economic considerations. One is that the poverty of individual students matters, and we agree with that. The other point is that the poverty of the schools in which students attend. It doesn't matter the hypothetical that they give, and that hypothetical, it doesn't matter how poor that kid is. He's not getting in under this program, right? That's correct, because the DOE, and this, if we're talking about what economic considerations have to be in place, we're looking at rational basis review. And the district, the Department of Education has the ability to say that not only is individual poverty important, but the poverty of the neighborhood, the poverty of the school in general matters. That a student who is themselves poor and could be direly, in dire straits, who is nonetheless attending a more affluent school, it is not an unreasonable determination to say that that student is not as disadvantaged as someone who is also individually poor and also attends a school where the majority or the large majority of students are also facing similar problems, similar poverty. That is a consideration that the Department of Education is able to make and did make, and that explains the criteria here. Thank you, Your Honor. Mr. Keiser is reserved one minute. Thank you, Your Honor. I just want to make two quick points. First, on the institutional standing and irreparable harm, which are kind of related, the declarations that we submitted in February to the district court, they clearly outline that our expenditures in opposition, especially as far as the PTO and CACAGNY are concerned, are ongoing. And as Judge Bianco pointed out, they will continue as long as this program is in place. And there's no other, simply no other remedy because this is a continuing program that will be a continuing violation. Now, you heard our colloquy before about how you can cure this associational standing issue if it is indeed an issue. That's not a problem for you, right? On remand, we would certainly consider those things. And, Your Honor, the second point on racial intent, it's simply not true that there needs to be any particular animus towards a particular racial group in order to find that race was a motivating factor under Arlington Heights. Feeney clearly states that all that's necessary is that the decision maker decided to do what it did because it would have an effect on a particular racial group. And that's all that we have here. Thank you. Thank you very much. We'll reserve decision, and we are adjourned.